**In the**
**UNITED STATES DISTRICT COURT**
**for the SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| **JANE GUY,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| *vs.* | )   **CAUSE NO. 1:07-cv-1668-SEB-TAB** |
| | ) |
| **WEAVER POPCORN COMPANY, INC.,** | ) |
| | ) |
| Defendant. | ) |

<u>**E N T R Y**</u>
**on**
**Defendant's Motion for Summary Judgment (doc. 23)**

On December 11, 2006, a few short days after she turned fifty-four years old and three months after her husband suffered a serious heart attack, Plaintiff Jane Guy was terminated from her employment at Defendant Weaver Popcorn Company's  popcorn processing plant.  Weaver asserts that it fired Ms. Guy for violation of important safety rules.  Ms. Guy claims that Weaver fired her because of her age and her use of benefits under Weaver's health-care plan for her husband's care.  In this suit against Weaver, Ms. Guy alleges that her termination constitutes employment discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §621, *et seq.*, and benefits discrimination and interference under the Employee Retirement Income Security Program (ERISA), 29 U.S.C. §1140, *et seq..*  Amended Complaint, Counts 1 and 2.  Weaver moves for summary judgment on both of Ms. Guy's claims and, for the reasons explained herein, we grant its motion.

Summary judgment "should be rendered if the pleadings, the discovery and disclosure

1

materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether a genuine dispute of fact exists, a court construes all facts, and draws all reasonable inferences therefrom, in favor of the non-moving party. *Oxman v. WLS-TV*, 846 F.2d 448, 452 (7th Cir. 1988). "To raise a genuine issue of material fact, [the plaintiff] must do more than 'simply show that there is some metaphysical doubt as to the material facts.' '"A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party.'"" *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640-41 (7th Cir. 2008) (citations omitted). Therefore, the court does not weigh or find the facts; it determines only whether there is a genuine dispute about the facts in controversy that matter to the outcome of the suit; if such a dispute exists, then the weighing and finding of the facts is left for the jury at trial.

The material facts in this case — other than Weaver's specific motivation for its actions — are not in dispute. For the six years prior to her termination, Ms. Guy worked as a shift leader or "line lead"[1] in the NaksPak department of Weaver's Microwave division. A NaksPak is a combination package of kernels and pre-measured flavored oil for the concessions-sales market. Guy Dep. at p. 25-26. As senior on the two-person crew for her machine, Ms. Guy was responsible for mixing sunflower or coconut oil with flavorings and sending the mixture through

---

[1] There is a bit of immaterial confusion about her precise job title. Guy Deposition at pp. 26-27, and 36; (Defendant's Brief in Support (doc. 24) at p. 2 (describing Ms. Guy as a "Shift Leader (also known as Line Lead) for Line 1 in the NaksPak manufacturing area Microwave Department").

feed lines to the packing machines where the oil would be injected into the proper part of the NaksPak package.  The mixing of oil and flavoring took place in a separate Oil Room where batches of large, 1,600-pound vats of mixture were made.  After heated oil was pumped into the vat, Ms. Guy's job was to measure and add the flavoring to the vat.  The oil was heated in order to vaporize the flavoring allowing it to mix well with the oil; then the mixture was chilled for pumping through the feed lines to the packer machine.  *Id.* at 25-30, 37-38.

Throughout the time of her employment, Ms. Guy was aware of the contents of the "Weaver Popcorn Company Associate Handbook," the employee manual.  Specifically, she was aware that, as described in the Handbook's "General Safety Expectations" section, Weaver's safety rules required employees to wear all required Personal Protective Equipment, use all designated safety equipment required for the job, and comply with specific provisions established in the respiratory protection program.  *Id.* at 30-34.  She knew that Weaver had adopted a Respiratory Protection Program and Procedures in 2004, the purpose of which was to require use of respirators by employees who might be exposed to respiratory hazards.  *Id.* at 32-33.  She knew — from that program, from signage on the doors to the Oil Room, and instructions of management, among other sources — that Weaver, as a safety rule, required employees to wear prescribed respirators when present in the Oil Room.  *Id.* at 32-45, 57.  Weaver had issued a respirator specifically to Ms. Guy for her use in the Oil Room and periodically tested its fit and operation.  She regularly wore her respirator while working in the Oil Room.  *Id.*

Section 8 of Weaver's written Respiratory Protection Program and Procedures stated:

3

> Failure to comply with company procedures and this OSHA regulation requiring the use of Respiratory Protective Equipment is a serious violation of the Weaver Policies and Procedures.  Specific tasks may require this type of PPE [Personal Protective Equipment] in the future.  Disciplinary actions may include up to termination of employment.

*Id*., Exhibit 6.  Weaver's Associate Handbook contains similar language.  Under its Health and Safety Policy section, Disciplinary Procedures subsection, the Handbook reads:

> Serious or repeated violations of the provisions outlined in the Health and Safety Policy are grounds for *immediate termination of employment*.  Examples of conduct resulting in *immediate termination* of employment include but are not limited to the following:
>
> - **Fraudulent report of injury not arising from performance of job related tasks/activities**
>
> - **Failure to report incident.**
>
> - **Failure to secure energy sources necessary for lockout/tagout.**
>
> - ***Violation of Safety Work Rules***

(Plaintiff's Appendix of Evidence (doc. 29), Tab D (italicized emphases added)); Williams Affidavit ¶ 3.  The Conduct section of the Handbook includes the following:

> Anyone who fails to perform his or her job satisfactorily or is otherwise guilty of misconduct will be subject to discipline.  The types of formal discipline that may be imposed are covered in the Performance Improvement/Discipline Policy section.
>
> The following types of misconduct interrupt good working relationships and/or acceptable work performance will [*sic*] not be tolerated.  Violations of this type can result in corrective action up to and including *immediate termination*.  Examples of these types of serious misconduct include, but are not limited to:
>
>            *       *       *
>
> 7.  Disregard and behaving negligently so as to create a risk of serious injury to, or which causes serious injury to, any person on Company premises or on Company time.  In addition, willful violation of Company Safety rules and/or regulations.
>
>            *       *       *
>
> 13. Willful disregard and violation of the Company's Personal Appearance,

Hygiene, Safety, Security, and Houskeeping regulations.

(*Id.*)  The Performance Improvement/Discipline Policy section of the Handbook is intended "to establish a means to progressively and consistently assist Associates who require performance improvement/discipline" but also provides that, "[b]ecause circumstances vary in each case involving performance improvement/discipline, each situation will be handled on an individual basis."  (*Id.*)  This section describes a four-step progressive disciplinary process,[2] subject to the following qualifiers:

> Some situations require investigation.  An Associate may be suspended during the investigation.  After the investigation, the Associate will be informed of either "return to work" or of any performance improvement/discipline step up to and including termination.  This policy is to establish as [*sic*] a means to ensure consistency throughout the Company.  Management reserves the right to discipline Associates as deemed necessary and appropriate.
>
> **If Management determines (based on the circumstances and factual information) that the situation is more serious in nature, the procedures below need not be followed.  The Team Leader/Manager may initiate any of the steps below immediately.**

(*Id.*)  At the time of her termination, Ms. Guy was aware that violation of the rule that she wear a prescribed respirator while in the Oil Room could result in termination of her employment.  Guy Dep. at 57.

Weaver's plant manager at the time of Ms. Guy's termination of employment was Mr. Chris Williams.  Ms. Guy felt that her relationship with him was "pretty good" and she had no reason to believe that he would have any animosity toward her.  Guy Dep. at p. 25.  Her immediate supervisor during the two years prior to her termination was Dick Zachman, a team

---

[2] The steps are:  (1) Written Warning #1, (2) Written Warning #2, (3) Final Written Warning/Suspension, and (4) Termination.

leader.  Ms. Guy interacted frequently with him and, as with Mr. Williams, she "felt fine with

him" and had no reason to believe that he would have any animosity toward her for any reason.

*Id.* at 29-30.

On September 5, 2006, when her husband suffered a serious heart attack, Ms. Guy left

work on leave to care for him and did not return to Weaver until late October or early November

2006.  Guy Dep. at 51.  Ms. Guy's son, who also worked at Weaver's plant at the time, gave

unidentified "supervisors" unspecified information about her husband's ongoing health

condition.  Guy Dep. at pp. 90-91.  Weaver admitted that Ms. Black, its Human Resources

Manager, "had some knowledge of Plaintiff's husband['s] health condition," but it denied that

she or any of its manager was "fully aware" of his health issues.  Answer ¶ 14.

Although Weaver reserved the option to immediately terminate an employee for violation

of the respirator requirements, it typically gave offending employees a short suspension and final

warnings.  Williams Aff. ¶ 4.  Throughout 2006, however, Weaver became increasingly

concerned about the health hazards posed by diacetyl, or "butter flavor vapor," a flavoring used

by Weaver and the popcorn industry for decades.  Recent studies at the time, including one by

the National Institute for Occupational Safety and Health, indicated that diacetyl can cause

serious lung and respiratory problems when inhaled.  *Id.* ¶ 5.  Because diacetyl was used in the

flavoring that was vaporized in order to mix with oil, there was a risk of inhalation of diacetyl in

the Oil Room.  In response, Weaver decided to improve safety protections related to diacetyl use,

including "ratcheting up" enforcement of its respirator requirement for employees working in the

Oil Room.  *Id.* ¶ 6.  Consequently, on September 14, 2006, nine days after Ms. Guy took leave to

care for her husband, Plant Manager Williams sent the following e-mail to his team leaders and

production managers — but not to all employees and specifically not to Ms. Guy:

> Subject:   A Note on PPE, Quality, GMP's [*sic*] [Good Management Practices]
> and Security.
>
> If you catch an Associate going into the Oil Room, Confined Space, TF Room,
> Plant without their designated and proper PPE as defined by YOU the Leadership
> Team.....then you must Suspend on the spot pending Investigation which more
> than likely will lead to termination.  I am serious and sick and tired of the low
> road you guys are taking on the simply blocking and tackling of PPE, Quality,
> GMP's [*sic*] and Security.  Think of the bathroom incidents, trash in the parking
> lots, disregard for safety protocols, quality holds, and security breeches [*sic*]....all
> of this over the last 2 weeks.
>
> You guys are not setting high expectations on the use of PPE's [*sic*].  It is
> painfully obvious and you as Leaders will not grow with the Company if you do
> not improve this situation.
>
> The fruit of your efforts is captured in the number of incidents regarding Safety,
> Quality, GMP, and Security breeches [*sic*].  WE HAVE TOO MANY.
>
> Suffice to say.....we are falling way short of my expectations in these areas.  Step
> it up.

*Id.* ¶ 6 and Exhibit 1.  Weaver characterizes this as a "zero tolerance" enforcement policy for

respirator violations in the Oil Room, which represented a departure from the manner in which it

enforced its respirator policy in the past.  *Id.* ¶ 6.  Weaver took other steps at the time as well to

protect employees from inhalation exposure to diacetyl, including (1) spending nearly

$1,000,000 starting in October 2006 on new equipment, such as kettles with closed lids, tanks

requiring less employee interaction with the contents, and tanks with pressure sensors to monitor

potential releases of diacetyl; (2) supplying upgraded respirators and training to employees; (3)

increasing spirometry and epidemiological tests; (4) posting additional safety signage; and (5)

conducting a peer-review inspection of its facilities.  *Id.* ¶ 7.  Eventually, in August 2007,

Weaver ceased using diacetyl altogether.  *Id.*

While Ms. Guy was aware of this increased emphasis on safety compliance, including the use of respirators, toward the end of her employment, Guy Dep. at pp. 46-47, she was not aware of the enhanced "zero tolerance" or "ratcheting-up" of enforcement policy represented by Mr. Williams's e-mail when she returned to Weaver in late October or early November, or prior to the time of her termination.

On Friday, December 8, 2006, Ms. Guy, having entered the room wearing her respirator, was working in the Oil Room.  A co-worker, who was in training, mistakenly sent coconut oil instead of sunflower oil through the chiller and into the feeder lines.  The coconut oil froze and hardened in the lines which necessitated both Ms. Guy and her co-worker spending most of the morning heating the feeder lines to remove the coconut oil.  After completing that task, Ms. Guy told the co-worker that they needed a bucket to clean out the return lines.  The co-worker mistakenly thought that Ms. Guy told her to open a valve.  Ms. Guy pulled down her respirator, in order to be clearly heard, and told the co-worker not to open the valve but to get a bucket for clearing the return lines.   The co-worker left the Oil Room to retrieve a bucket, and Ms. Guy returned to the tasks at hand and neglected to pull up her respirator.  Her respirator remained around her neck for approximately five to ten minutes, until she left the Oil Room.  Guy Dep. at pp. 52-53.  Ms. Guy also did not wear her safety goggles during the twenty to thirty minutes that she was in the Oil Room, which she knew was also a violation of Weaver's safety rules.  *Id.* at pp. 53-54, 99.

Mr. Zachman (Ms. Guy's Team Leader and immediate supervisor) and Brad Summer, a

Quality Manager, arrived at the Oil Room to speak to Ms. Guy, at her request, about a pump problem on another machine that had been caused by members of another shift. When Ms. Guy left the Oil Room to speak with them, her respirator was still around her neck. Messrs. Zachman and Summer finished the conversation and departed without mentioning either her unused respirator or lack of goggles. Some twenty minutes later, Mr. Zachman returned to inform Ms. Guy that she had put him in an awkward position because he and Mr. Summer had observed that she had been in the Oil Room without using her respirator and he was required to report the incident to Mr. Williams. *Id.* at pp. 54-56. During this conversation, Ms. Guy acknowledged to Mr. Zachman that she was aware of Weaver's rules that she wear a respirator and goggles in the Oil Room and that violation of those rules could result in termination of employment. *Id.* at 57. She explained that she had previously been wearing her respirator, but needed to remove it to speak to her co-worker, and that she had simply neglected to pull it back up. In any event, it had been not in use for only a few minutes. Shortly thereafter, Mr. Zachman reported to Mr. Williams that Ms. Guy had been in the Oil Room without wearing her respirator or goggles. Williams Aff. ¶ 8. Mr. Williams instructed Mr. Zachman to immediately suspend Ms. Guy pending a review that would almost certainly result in termination. *Id.* Mr. Zachman returned to inform Ms. Guy that she was being suspended immediately and that there would be a meeting about the incident on Monday following an investigation. Guy Dep. at p. 56.

Mr. Williams consulted with Dawn Black, Human Resources Manager, and Troy Thomas, Production Manager, and determined that Ms. Guy had violated the respirator rule and that she was aware that such a violation could result in termination. Mr. Williams therefore "felt that [he] had no choice," decided to fire Ms. Guy, and directed Ms. Black and Mr. Thomas to

meet with Ms. Guy on Monday and terminate her.  Williams Aff. ¶ 8.  On Monday, December

11, 2006, Ms. Guy met with  Ms. Black and Mr. Thomas,  Guy Dep. at pp. 58, and explained the

circumstances relating to her failure to wear her respirator and goggles in the Oil Room.  Guy

Dep. at pp. 58-60.  Mr. Thomas told her that he had no choice but to terminate her employment

and Ms. Guy therefore left work following the meeting.  As a consequence of her termination,

her enrollment in Weaver's health-insurance plan also ended that day.  *Id.* at p. 60.  She did not

sign up for temporary continuation of coverage under COBRA because she apparently could not

afford the premiums.  *Id.* at p. 61.

For the five years prior to her termination, Ms. Guy had not received any discipline or

warnings for safety violations.[3]  *Id.* at pp. 108-09.  Other than Ms. Guy, no employee is known to

have committed a respirator-rule violation since implementation of the zero-tolerance policy in

September 2006.  Williams Aff. ¶ 9.

### ADEA claim

The ADEA makes it illegal to terminate an employee because of her age.  29 U.S.C. §

623(a)(1).  To establish a violation of the ADEA, a plaintiff must prove that her age had a

"determinative influence on the outcome," in other words, that she would not have been

terminated but for her employer's intentional age-based discrimination.  *Gross v. FBL Financial*

*Services, Inc.*, No. 08-441, slip op. at 7-9, 2009 WL 1685684 (U.S., June 18, 2009); *Faas*, 532

F.3d at 641; *Jackson v. E. J. Brach Corp.*, 176 F.3d 971, 982 (7th Cir. 1999).  Age-

---

[3] She, along with others, had once received a verbal warning or reprimand for a non-
safety-related violation.  *Id.* at pp. 108-09.

discrimination claims may be proved by either the direct or indirect methods.  A plaintiff proceeding by way of the direct method presents either direct or circumstantial evidence of a defendant's discriminatory intent.  The indirect method involves presenting circumstantial evidence of intent according to the three-step burden-shifting protocol of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  This protocol requires, first, that a plaintiff establish, by a preponderance of the evidence, the following elements of a *prima facie* case of age discrimination:  (1) the plaintiff is a member of the protected class; (2) she met the legitimate expectations of her employer, (3) she was terminated, and (4) her employer treated similarly-situated employees, who were substantially younger, differently. *Faas*, 532 F.3d at 641; *Jackson*, 176 F.3d at 982-83.

If she makes such a showing, a rebuttable presumption of discrimination arises and the burden of production shifts to the defendant to present a legitimate, non-discriminatory reason for its termination of the plaintiff.  If it succeeds, the presumption of discrimination disappears and the burden of production[4] returns to the plaintiff to prove that the defendant's reasons are merely pretexts for discrimination.  Pretext itself may be proved in one of two ways:  either directly by evidence showing that the employer was more likely than not motivated by a discriminatory reason or indirectly by evidence showing that the employer's asserted reason is not credible and raises "at least an inference" that the real reason for the employer's action was discriminatory. *Jackson*, 176 F.3d at 983.  To survive summary judgment, a plaintiff need not

_____

[4] While the burden of production shifts under *McDonnell Douglas*, the burden of persuasion always remains with the plaintiff. *Peirick v. Indiana University – Purdue University at Indianapolis Athletics Dept.*, 510 F.3d 681, 687 (7th Cir. 2007); *Jackson*, 176 F.3d at 982.

present direct evidence of intentional discrimination; she need only present indirect proof of pretext that also supports an inference of intentional discrimination. *Id.* at 984. Pretext evidence that also implies intentional discrimination is required because a plaintiff must show more than simply that the employer's asserted reason is wrong or mistaken; it must be shown to be dishonest, a lie, a fabrication — a phony reason. *Faas*, 532 F.3d at 642-43. An indirect showing of pretext includes evidence that the employer's asserted reason is factually baseless, was not its actual motivation, or was insufficient to motivate the employer. *Jackson*, 176 F.3d at 983.

When there is a dispute about whether the plaintiff was meeting her employer's legitimate expectations (*i.e.*, the employer's asserted non-discriminatory reason for termination is failure to meet expectations), the second and fourth elements of the *prima facie* case merge with the pretext showing, and a court may begin with the pretext analysis. *Faas*, 532 F.3d at 642; *Peirick v. Indiana University – Purdue University at Indianapolis Athletics Dept.*, 510 F.3d 681, 687 (7th Cir. 2007).

Ms. Guy relies on the direct and indirect methods of proof to prove her ADEA claim. She disputes that she was not meeting Weaver's legitimate expectations, and her direct evidence of discriminatory intent is also the evidence on which she relies to show pretext. Therefore, in terms of our analysis, she contends that the second and fourth steps of her *prima facie* case merge with her burden to show pretext, which also merges with her direct evidence of discriminatory intent.

At fifty-four years of age at the time of her termination, there is no dispute that Ms. Guy was within the class of older workers protected by the ADEA and there is no dispute that

Weaver terminated her.  Weaver argues, however, that she cannot establish the second and fourth

steps of her *prima facie* case:  that she was meeting its legitimate expectations, because there is

no dispute that she violated the company's safety rules when she failed to properly wear her

respirator and goggles while in the Oil Room, and that similarly-situated employees were treated

differently, because no such showing has been made by her.  Weaver asserts that it terminated

Ms. Guy for violations of its safety rules, which is a legitimate, non-discriminatory reason.  In

response, Ms. Guy argues that this reason is pretextual because a reasonable jury could infer that

Weaver deliberately refused to inform her of its change to a "zero-tolerance" policy in order to

trap her in a violation so that it could terminate her.  Ms. Guy also relies on Weaver's failure to

personally inform her of its enforcement policy change as direct evidence of Weaver's age-based

discriminatory motive for her termination.

**Meeting legitimate expectations.**  Ms. Guy admits that, on December 8, 2006, she

violated Weaver's safety-related rules requiring employees to wear respirators and goggles while

in the Oil Room.  She does not dispute that Weaver had legitimate grounds for these rules or

that, at the time, she was aware of Weaver's written policies that such serious violations could

result in immediate termination rather than progressive discipline.  Weaver argues that Ms.

Guy's acknowledgment that she violated its known rules dooms her claims under *McDonnell*

*Douglas* because she clearly was not meeting Weaver's legitimate expectation of compliance

with its important safety rules.  Ordinarily, this would indeed end the analysis; however, where

an employee admits violating company rules but contends that her employer discriminatorily

applied its discipline, the legitimate-expectations analytical step merges with the pretext inquiry.

*Gates v. Caterpillar, Inc.*, 513 F.3d 680, 691 n. 8 (7th Cir. 2008); *Curry v. Menard*, 270 F.3d 473

13

(7th Cir. 2001).  Therefore, for now, we shall skip this step and proceed to examine the fourth

step of Ms. Guy's *prima facie* showing.

   **Similarly-situated employees treated differently.**  Ms. Guy points to two substantially

younger employees, both approximately 37 years old,[5] who violated the same or similar safety

rules and worked under the same immediate supervisor, Mr. Zachman, but who were subjected

only to the initial steps of progressive discipline rather than immediate termination.  According

to Ms. Guy, Mary Ann Browning received several verbal warnings and at least one written

warning about her violation of PPE rules which required the use of ear plugs, safety glasses, and

respirator.  In June 2005, Ms. Browning was suspended for one day for not wearing her

respirator in the Oil Room.  Complaint ¶ 6; Guy Dep. at pp. 70-71.  Greg Reece worked full-time

in the Oil Room and was therefore required to wear his respirator most of the time.  He received

a warning and, in November 2005, was suspended for one day for not wearing his respirator in

the Oil Room.  Complaint ¶ 6; Guy Dep. at p. 72.  Both employees are still working at Weaver.

   The fatal problem with Ms. Guy's comparators is that both received their discipline for

safety-rule violations long before Weaver's adoption of its stricter "zero-tolerance" enforcement

policy in September 2006.  There is no dispute that Weaver's prior enforcement policy

(typically, meting out warnings and short suspensions) was more lenient than the tougher policy

described in Mr. Williams' e-mail memorandum.  Williams Aff. ¶ 4; Guy Dep. at pp. 70-72, 101-

109.  But, while stricter disciplinary policies might appear discriminatory to employees who are

---

   [5] Because Weaver does not dispute that these employees were "substantially younger"
than Ms. Guy, we assume that they were.

disciplined shortly after their implementation and, thus, make their claims of discriminatory treatment more difficult to prove because of a lack of comparators, the ADEA does not forbid employers from adopting stricter enforcement standards on pain of looser standards for discrimination claims.  *See*, *e.g.*, *Messina v. E. I. du Pont de Nemours and Co.*, 308 F.Supp.2d 491, 497 (D. Del. 2004), *affirmed on other grounds*, 141 Fed.Appx. 57 (3rd Cir. 2005).

Ms. Guy responds that Weaver's "new" policy was neither new nor genuine; therefore, Mr. Reece and Ms. Browning are still valid comparators.  She bases this argument on the fact that Weaver failed to notify her of the policy change that was introduced while she was absent from work tending to her husband's health needs:

> There is no evidence that Weaver made any effort to notify Guy of this alleged "new" disciplinary enforcement policy, which in turn raises an inference that no such notice was given her because the policy was not "new" at all, but rather only a reiteration, or emphasis, of Weaver's pre-existing policy as memorialized in its employee handbook.  (Plaintiff's Appendix, Tab D).
>
> The fact that Guy was not notified of this alleged change is also significant because it suggests that Weaver did not take its own new and purportedly more stringent rule as seriously as it now claims.  . . .  Indeed, had Weaver intended to enforce the respirator rule more stringently and without any possibility of progressive discipline, it would seem to be a logical assumption that it would have taken all reasonable steps to be certain that [*sic*] change was clearly and adequately communicated to all of its employees, including to Guy and any other employees who may have been temporarily absent from work.  Under these circumstances it would be improper for this Court to give this alleged more stringent enforcement policy more importance than Weaver itself did.

(Plaintiff's Response (doc. 28) at p. 15).  Whereas Weaver's previous enforcement policy only *allowed* suspension pending investigation and *permitted* bypassing progressive discipline and

moving directly to immediate termination for safety violations,[6] Mr. Williams's September 2006 policy *required* immediate suspension of violators pending investigation and established a *presumption*, or at least a high likelihood, of termination for respirator violations.[7] Therefore, under the new policy, the discretion of frontline decisionmakers, when applying the existing disciplinary policies, was substantially reduced. There can be no genuine dispute that this policy, as designed, amounted to a real and substantial "ratcheting up" of enforcement of Weaver's safety rules. If not an "absolute-zero tolerance" policy, it clearly approached that, and it was in fact a "new" policy.

Ms. Guy's fallback argument is that, regardless of its terms, the "new" policy doesn't matter because it was not genuine: Weaver did not take it seriously and did not intend to enforce the respirator rule more stringently. Therefore, in reality, it was the pre-September 2006 enforcement policy that was still in effect at the time of her termination and Ms. Browning and Mr. Reece are still valid comparators. Ms. Guy's only measure of Weaver's genuineness about its policy change is whether it informed her and other employees of it: "Had Weaver intended to

---

[6] As noted earlier, the formal policy, as expressed in the Associate Handbook and Respiratory Protection Program and Procedures, provides that serious violations of safety rules "are grounds for" or "can result in" immediate termination. When describing progressive disciplinary steps, the Handbook states that, in cases of violations of a "more serious nature", progressive discipline "need not be followed," but Weaver "may initiate any of the steps below immediately," including termination.

[7] In its briefs, Weaver describes this policy as "almost certainly" resulting in termination for violators. While neither Mr. Williams's e-mail nor his affidavit use this exact description, it is nonetheless accurate, especially considering Mr. Williams's and Weavers's description of the policy as a "'zero tolerance' position for enforcement of respirator violations in the Oil Room," Williams Aff. ¶ 6, and Mr. Williams's e-mail's strongly worded displeasure about the current lax enforcement and his not-so-subtle warnings of consequences for the addressees if enforcement weren't tightened up and the company's safety record did not improve.

enforce the respirator rule more stringently . . . it would seem to be a logical assumption that it would have taken all reasonable steps to be certain that [*sic*] change was clearly and adequately communicated to all of its employees, including to Guy and any other employees who may have been temporarily absent from work." (Plaintiff's Response at p. 15). But no such evidence was submitted, by either side, regarding any steps that Weaver took, or did not take, to inform its employees of the new policy[8] or regarding employees' awareness of the new policy. Without evidence of these contextual circumstances, the mere fact that Ms. Guy herself was unaware of the new policy, perhaps understandably, given her absence from the plant at the time, does not reasonably support an inference that Weaver, deliberately or not, failed to take appropriate steps to inform its employees.

Ms. Guy's argument is premised on faulty logic. It would be reasonable to assume that a correlation could be established between prior notice of a new, stricter enforcement policy and improved compliance. Nonetheless, the absence of such prior notice does not establish that the stricter enforcement policy was a sham. Ms. Guy confuses the effectiveness of a policy with the underlying sincerity in adopting it. Mr. Williams's affidavit and e-mail assert that he intended to achieve better compliance with respirator rules by imposing more severe sanctions for violations.

---

[8] Mr. Williams's affidavit describes additional measures Weaver took to increase safety, including providing employees with upgraded respirators and training and posting additional signage. Williams Aff. ¶ 7. Whether warnings of stepped-up sanctions for violations of safety rules were included in or accompanied the additional training and signage we have not been told. Ms. Guy was asked at her deposition whether she was aware that "Weaver held all-employee meetings in October 2006 to inform employees that it was going to crack down on safety violations," Guy Dep. at p. 51, but there were no follow-up questions. Mr. Williams did not mention such meetings in his affidavit, and Weaver's brief in support of the present motion does not reference any such meetings.

While, theoretically, prior notice to employees of the more severe sanctions might advance compliance — and thereby eventually reduce, or avoid entirely, the actual imposition of more severe sanctions — this raises an issue of whether the policy works, rather than whether its promulgation was well-intentioned.[9]  It is equally reasonable to assume that, once the more severe sanctions were imposed without prior notice, compliance would improve, resulting in a reduction in the need for sanctions.  Though Ms. Guy seems to suggest that her idea for securing compliance is more effective than Weaver's, the ADEA does not require business efficiency. Her claim that no notice in the change in policy turns it into a sham is simply untenable, both in terms of logic and fact.

Ms. Guy does not dispute Weaver's evidence that no other employee committed a respirator violation after implementation of the new enforcement policy in September 2006. Williams Aff. ¶ 9.  Thus, even without prior notice to all employees of its change in enforcement

---

[9] Ms. Guy's argument is more accurately one based on timing.  Weaver's written policies gave clear notice to employees that violations of safety rules, specifically respirator rules, would subject violators to the possibility of non-progressive, immediate termination.  There are no provisions in those published policies that regulate or limit management's discretion in choosing which discipline option to impose in such cases.  That changed with Mr. Williams's September 2006 instruction.  The new policy limited the decisionmakers' discretion to choose among the discipline options in cases where employees "go[] into the Oil Room, Confined Space, TF Room, Plant without their designated and proper PPE."  Prior (unwritten, unnoticed) discretionary practice permitted only verbal or written warnings and short-term suspensions for respirator violations.  In effect, Ms. Guy claims that this practice created an unwritten "policy" upon which employees relied in determining their level of attention to and compliance with the respirator rules.  Ms. Guy implicitly faults Weaver for changing its (unwritten, unnoticed) "policy" without prior notice, even though, as a discretionary practice, it too had not previously been formally published or noticed.  Once terminations would actually have occurred based on Mr. Williams's new policy, a new (unwritten, unnoticed) practice or "policy" would similarly have been established upon which employees would rely in determining their new level of attention to and compliance with the respirator rules.

practice, Weaver has achieved significantly improved compliance with the respirator rule.  This experience also contradicts Ms. Guy's argument that the absence of prior notice supports an inference of employer disingenuousness.

Because Ms. Guy has failed to show that any substantially younger, similarly-situated employee(s) were treated differently than she was, her *prima facie* case of age discrimination fails under the *McDonnell Douglas* method of proof.

**Direct method of proof and pretext.**  Ms. Guy also seeks to prevail under the direct method of proving age discrimination.  As evidence of discriminatory intent, she relies on:  (1) Weaver's failure, or refusal, to notify her personally of its September 2006 enforcement policy change; (2) the fact that she was the only employee terminated for a respirator violation; and (3) Mr. Zachman's initial failure, or refusal, to say anything to her about her respirator violation during their conversation outside the Oil Room.  First, Ms. Guy contends that "[a] jury could . . . reasonably conclude that Weaver deliberately failed to notify Guy of this alleged new and more stringent enforcement policy for illegal and discriminatory reasons," (Plaintiff's Response at p. 15), and that "[t]his lack of notice itself also may constitute direct evidence of discriminatory intent," (*id.* at p. 14).  Second, she argues that "[t]he fact that her termination for failing to properly wear her respirator was an unprecedented event in and of itself is evidence of questionable actions and motives . . . ."  (*Id.* at p. 18).  Third, she argues:

> Similarly, the fact that Zachman initially said nothing to Guy after observing her mask pulled down, but instead was apparently more fixated on reporting her violation to higher management, also tends to cast doubt on Weaver's implied assertion that its alleged more stringent enforcement policy regarding safety rule violations was motivated by a desire to protect employee health and safety as opposed to being used as a trap to rid itself an [*sic*] older employee such as

Plaintiff.

(*Id.*)  She relies on these facts to show as well that Weaver's asserted non-discriminatory reason

for terminating her — *viz.* her violation of its respirator rule — is a pretext for discrimination.

Although we concluded above that Ms. Guy failed to show a *prima facie* case of discrimination

because she could point to no comparators, our discussion here also constitutes a pretext analysis

as an alternative ruling on Ms. Guy's *McDonnell Douglas* showing.

Weaver's failure or refusal to notify Ms. Guy personally of its September 2006

enforcement policy change can support an inference that it intended to trap her into a terminable

rule violation only if it is shown, at the least, that Weaver warned younger employees, but not

older employees, of its policy change.  But, as we observed above, no evidence has been

presented showing if Weaver attempted to notify Ms. Guy of the policy change; if it notified *any*

employees; if so, who it notified, by age class; and when it notified them.  By itself, the fact that

Ms. Guy was simply unaware of the rule change does not support a reasonable inference that

Weaver intentionally terminated her because of her age.

Weaver's termination of Ms. Guy for a respirator-rule violation was unprecedented; it is

undisputed that she was the first, and ultimately the only, employee who violated the respirator

rule after adoption of the stricter September 2006 enforcement policy.  However, because there

is no evidence, or even suggestion, that any other employee, regardless of age, violated the

respirator rule after September 2006 but received a lighter sanction, the fact that Ms. Guy's

termination was unprecedented simply does not establish that it was motivated by her age rather

than her conduct.

20

Finally, it is difficult to understand Ms. Guy's argument regarding Mr. Zachman's initial failure to mention her respirator violation.  When he and Mr. Summer observed Ms. Guy working in the Oil Room without using her respirator and goggles after which they conversed with her when she emerged from the Room, her violation of the safety rules had, at the time of these discussions, already occurred and Mr. Zachman's non-discretionary duty under the new policy to take action had already arisen.  There is no indication in the evidence that she was intending or was likely or expected to re-enter the Oil Room without her respirator.[10]  Any mention of her violation at that time could not have altered the course of events regarding her termination.  In addition, the undisputed facts make clear that, the first time, Mr. Zachman did not leave Ms. Guy in order to inform Mr. Williams of her violation; the evidence does not reveal precisely what Mr. Zachman did or where he went after leaving Ms. Guy on that occasion; it does indicate that he did not tell Mr. Williams about Ms. Guy's derelictions until after his second departure.  When Mr. Zachman returned to Ms. Guy, approximately twenty minutes later, he specifically discussed her violations of the safety rules and told her what he was obligated to do about them pursuant to the new policy.  The fact of this twenty-minute delay in Mr. Zachman's mentioning to Ms. Guy the consequences of her respirator and goggles violation cannot support

---

[10] Ms. Guy testified that she exited the Oil Room to talk to Mr. Zachman after "[she] finished what [she] was doing."  Guy Dep. at p. 54.  There is no indication from her testimony that she re-entered the Oil Room after Mr. Zachman left, that she intended to re-enter the Oil Room after he left, that she informed him that she would re-enter the room, or that it was reasonable to expect that she would re-enter the Oil Room within twenty minutes without wearing her respirator.  She testified that she entered the Oil Room properly wearing her respirator and then simply forgot to re-position it after instructing her co-worker.  Without more, there is no support for an assumption that she would have re-entered the Oil Room without wearing her respirator and thus to suggest that Mr. Zachman's failure to mention it for twenty minutes demonstrates a false concern about safety and a real discriminatory motive.

21

Ms. Guy's inference that Mr. Zachman possessed a discriminatory motive.  It was Mr. Williams, in any event, not Mr. Zachman, who had adopted the stricter enforcement policy and who made the decision to terminate Ms. Guy.  There simply is insufficient evidence to support an inference that Mr. Zachman was "more fixated on reporting her violation to higher management" than ensuring her compliance with the respiratory rule.  Even if such an inference could be drawn from the available evidence, it would not reasonably support a further, relevant inference that Mr. Williams's adoption of the September 2006 enforcement policy or his failure to ensure that Ms. Guy was notified of it on a timely, preventative basis was motivated by Mr. Williams's intention to terminate her based on her age.

Ms. Guy has thus failed to show by direct evidence that Weaver's termination of her was the result of age-based discrimination and further that Weaver's assertion that her termination was in fact the result of her violation of safety rules was merely a pretext for age-based discrimination.

Having failed to show, either by the *McDonnell Douglas* formulation of proof or by the direct method of proof, that there is a genuine dispute of fact about whether Weaver terminated her because of her age, Ms. Guy cannot prevail on her ADEA claim and Weaver is entitled to judgment as a matter of law with respect to this allegation.

### ERISA claim

ERISA makes it illegal to discharge an employee for exercising any right to which she is entitled under an employee-benefit plan or for the purpose of interfering with the attainment of any right to which she might become entitled under the plan or ERISA.  29 U.S.C. § 1140.  An

action under ERISA requires proof that the employer acted with the specific intent to deprive the employee of benefits or to retaliate against her for using benefits, *Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 295 (7th Cir. 1998); *Lucas*, 539 F.3d at 668 (a plaintiff must demonstrate that the employer had the *specific intent* to violate the statute and to interfere with an employee's ERISA rights"), which also requires proof of pretext, *i.e.*, that the employer's asserted non-ERISA-related reason for terminating the employee is dishonest with an inference that the real reason is to intentionally prevent or retaliate for the employee's use of benefits, *id.*, at 296. Specific intent may be shown by direct or circumstantial evidence, and the *McDonnell Douglas* avenue of proof is also available to ERISA plaintiffs. *Id.*; *Lucas*, 539 F.3d at 668. To make out a *prima facie* case of an ERISA violation under the *McDonnell Douglas* burden-shifting method, a plaintiff must present evidence that: (1) she belongs to the protected class, (2) she was qualified for her position, and (3) she was terminated under circumstances that support her claim that the employer intended to prevent or retaliate for her use of benefits. *Lucas*, 539 F.3d at 668; *Lindemann*, 141 F.3d at 296. "[I]t is unnecessary . . . to determine whether a plaintiff has established a prima facie case where a defendant has advanced a legitimate, nondiscriminatory reason for its action. '"Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant."'" *Lindemann*, 141 F.3d at 296 (citations omitted).

There is no dispute that Ms. Guy falls within the class of employees protected by ERISA. A determination of whether she was qualified for her position tracks the analysis applied in analyzing her ADEA claim with respect to whether she was meeting Weaver's legitimate expectations. In addition, the Court must analyze, in terms of Weaver's specific

23

intent/pretext, whether the circumstances of Ms. Guy's termination demonstrate that Weaver terminated her with the intent to deprive her of her ERISA benefits.  Ms. Guy relies on two circumstances to establish Weaver's specific intent:  first, the fact that Weaver was concerned about its rising health-care costs and had undertaken specific efforts to encourage its employees to lead healthier lifestyles, and, second, the fact that Weaver terminated her a mere three months after her husband accessed health-insurance benefits under Weaver's Plan for his heart attack.

Ms. Guy testified that she had been present at company meetings with all employees and witnessed the discussions by Weaver supervisors which emphasized the importance of employee health and safety concerns, stating that "[w]e need to keep costs our costs down.  The less accidents we have, the less health things we have, that is pluses [*sic*] for us as a company."  Guy Dep. at pp. 77-78.  According to Ms. Guy, Weaver also implemented various screening and incentive programs aimed at helping employees reduce their health-care costs by improving their health:

> Q    And can you tell me about that?
>
> A    Just they gave us a health screen every year. And if we fell into a criteria of certain points and stuff, we would get a discount.  They allowed us more money towards our insurance, to bring our costs down, as in, you know, physical, if we exercised, if we — I don't remember all of them at this point.
>
> Q    Okay.
>
> A    Blood pressure, cholesterol.

(Guy Dep. at pp. 68).  Ms. Guy saddles this evidence with a weightier inference than it can bear. It is a rare employer these days that is not concerned about keeping its employee-benefit plan costs as low as possible.  Such a concern does not evidence an intention by such an employer or

business that it would violate the law in order to advance this interest.  To allow an illegal

motivation to be imputed to any employer who offers its employees a benefits plan would

undermine the very benefits employees value and open employers to discrimination claims when

their intentions were entirely to the contrary.  *See Unida v. Levi Strauss & Co.*, 986 F.2d 970,

980 (5th Cir. 1993).  The only evidence that Weaver acted to minimize its costs was its

exhortations and incentives to employees to improve their safety and health.  Such evidence falls

far short of establishing that Weaver intended to illegally interfere with or retaliate against Ms.

Guy's use of Plan benefits.[11]  She presented no evidence of comparators and no evidence of a

pattern or practice on the part of Weaver to terminate other employees who had higher-than-

normal benefits use.  The evidence presented here fails to support any reasonable inference that

Weaver terminated Ms. Guy because of her use of ERISA benefits, rather than for violation of

the safety rules.

        The fact of the timing of Weaver's termination of Ms. Guy (three months after she

returned from work) also fails to support an inference of specific intent or pretext on the part of

Weaver.  First, a three-month interval alone is not sufficiently proximate to suggest a

discriminatory motive or an inference that Weaver's asserted reason is dishonest.  Weaver's

stricter enforcement policy was adopted a mere nine days after Ms. Guy's husband's heart attack

---

        [11] Ms. Guy alleged that her husband was a covered insured under her health-insurance
plan with Weaver and that his heart attack resulted in substantial health-care costs being incurred
by Weaver's group health-insurance carrier.  Amended Complaint, ¶ 14.  Weaver generally
denied these allegations.  Answer, ¶ 14.  It is apparent from Ms. Guy's complaint and argument
that she contends that Weaver's illegal ERISA interference and retaliation were related to Ms.
Guy's husband's use of health-insurance benefits as a covered insured and not to her use of leave
time to care for her husband.  No allegation was made or evidence presented regarding any
ERISA-qualified benefits that Weaver provided for family medical leave.

while she was on leave to care for him.  Ms. Guy points to no evidence and asserts no inference that Weaver failed to enforce its stricter discipline against safety-rule violators until she returned to work or that it failed to enforce it against violators without higher-than-normal use of benefits after she returned to work.

Secondly, there is no evidence that Weaver's decisionmakers and advisers regarding Ms. Guy's termination were even aware of Ms. Guy's high use of benefits or how her utilization of benefits compared to other employees' benefits use.  The only evidence was that Ms. Guy's son had told unidentified "supervisors" at Weaver certain unspecified information about Mr. Guy's health condition and that, on that basis, Ms. Black, Weaver's Human Resources Manager and an adviser on Ms. Guy's termination, had some knowledge of that health condition, though admittedly not fully apprised of the details of it.  It simply cannot be assumed on this basis that Mr. Williams and others involved in Ms. Guy's termination were in fact aware of the details of Ms. Guy's use of insurance benefits or the impact of her use of benefits on Weaver's overall benefits costs compared to that of other employees.

Accordingly, Ms. Guy has failed to show a genuine dispute of material fact regarding whether Weaver terminated her with the specific intent to deprive her of benefits under its benefits plan.  Weaver is therefore entitled to judgment on the ERISA claim as a matter of law.

## Conclusion

Defendant Weaver Popcorn Company has demonstrated that there are no genuine issues relating to Plaintiff Jane Guy's ADEA and ERISA claims and that Weaver is entitled to final judgment.  Therefore, Weaver's motion for summary judgment on the Amended Complaint is

**GRANTED** and judgment shall enter accordingly.


Date: 06/25/2009


SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana


Distribution:

William R. Groth
Fillenwarth Dennerline Groth & Towe, LLP
wgroth@fdgtlaborlaw.com

Edward E. Hollis
Baker & Daniels, LLP
eehollis@bakerd.com

David S. Wagner
Baker & Daniels, LLP
david.wagner@bakerd.com